IN THE UNITED STATES COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA

Peter Waldburger
Asheville, NC

Sandra Ratcliffe
Asheville, NC

Lee Ann Smith
Arden, NC

Tom "Bud" Pinner, IV and Patricia Pinner
Asheville, NC

Tom "Buddy" Pinner, III and Madeline Pinner
Asheville, NC

Hans and Wilma Momkes
Asheville, NC

Walter Dockins, Jr. and Autumn Dockins
Skyland, NC

William Clark Lisenbee
Asheville, NC

Dan and Lori Murphy
Asheville, NC

Robert Aversano
Asheville, NC

Daniel L Murphy
Asheville, NC

Laura A Carson
Asheville, NC

Glen and Gina Horecky
Asheville, NC

Renee Richardson and David Bradley
Asheville, NC

Case No. 1:11cv39

**COMPLAINT**

Byron and Ramona Hovey
Asheville, NC

and

Peter Tatum MacQueen, IV and
Bethan MacQueen
Asheville, NC

        Plaintiffs,

vs.

CTS CORPORATION
c/o Its Statutory Agent
RICHARD G CUTTER
ELKHART, IN

        Defendant.

Now come the Plaintiffs, Peter Waldburger, Sandra Ratcliffe, Lee Ann Smith, Tom "Bud" Pinner, IV, Patricia Pinner, Tom "Buddy" Pinner, III, Madeline Pinner, Hans Momkes, Wilma Momkes, Walter Dockins, Jr., Autumn Dockins, William Clark Lisenbee, Dan Murphy, Lori Murphy, Robert Aversano, Daniel Murphy, Laura A Carson, Glen Horecky, Gina Horecky, Byron Hovey, Ramona Hovey, Renee Richardson, David Bradley, Bethan MacQueen and Peter Tatum MacQueen, IV (hereinafter "Plaintiffs") by and through counsel, and for their complaint allege and aver as follows:

## I. PARTIES AND JURISDICTION

1) At all times herein mentioned Plaintiffs were and now are residents of Buncombe County and the State of North Carolina.

2) At all times relevant Defendant, CTS CORPORATION, (hereinafter "CTS Corp.") was a corporation organized and existing under the laws of the State of Delaware, with its principal place of business Elkhart, Indiana, and was licensed to do business in the

2

State of North Carolina.

3) Jurisdiction exists pursuant to 28 U.S.C. 1332 in that there is diversity of citizenship between the Plaintiffs and the Defendant, and the amount in controversy is in excess of SEVENTY FIVE-THOUSAND DOLLARS ($75,000.00), exclusive of interest and costs.

4) Pursuant to 28 U.S.C. § 1391(a)(2) and (3), venue is proper in this Court, because a substantial part of the events or omissions giving rise to the claim occurred in North Carolina, and because the Court has personal jurisdiction over the defendant in this district.

## II. FACTUAL ALLEGATIONS

5) CTS of Asheville, Inc. ("The corporation") was a corporation existing under the laws of the State of North Carolina formed on or about April 16, 1959 and was dissolved on December 29, 1983.

6) A true and correct copy of the Articles of Incorporation of CTS of Asheville, Inc. is attached hereto and incorporated by reference as Exhibit "1."

7) One of the expressed purposes for forming CTS of Asheville, Inc., as stated in the Articles of Incorporation was:

> To manufacture, construct, fabricate, produce, buy, purchase, acquire, deal in, sell and otherwise dispose of, both at wholesale and retail, electronics, electro-mechanical, electrical, radio, radar, telephone, television, and all kinds of parts, articles, devices, supplies, accessories, attachments and merchandise.

Exhibit "1" at paragraph 3(a).

8) As part of the operations of CTS of Asheville, Inc. various toxic solvents, including by not limited to trichloroethylene (TCE), cyanide, chromium VI, and lead were used in the manufacturing process for the electrical and electronic components that

were manufactured by the corporation.

9) Prior to 1986, CTS of Asheville of Asheville, Inc. used the all of the above listed chemicals and other volatile organic compounds in its operations at the Mills Gap Road Electroplating Facility.

10) As of 1981, CTS of Asheville, Inc. stored 495,000 gallons of trichloroethylene at the Mills Gap Road facility and had shipped no trichloroethylene off site for processing.

11) A true and correct copy of CTS of Asheville, Inc.'s "1981 Hazardous Waste Generators Annual (Part A) Report" signed by Norman Lewis on February 4, 1982 is attached hereto and incorporated by reference as Exhibit "2."

12) In 1982, CTS of Asheville, Inc. reported a decrease in its storage of trichloroethylene at the Mills Gap Road facility to 330,000 gallons and claimed to have shipped an additional 5,070,000 pounds of trichloroethylene to "Armegdon [sic] Chemical" in Durham, North Carolina. Exhibit "3."

13) A true and correct copy of CTS of Asheville, Inc.'s "Hazardous Waste Generators Annual [for calendar year 1982] (Part A) Report" signed by Norman Lewis on February 22, 1983 is attached hereto and incorporated by reference as Exhibit "3."

14) On December 29, 1983, CTS of Asheville, Inc. was dissolved as a North Carolina corporation. Attached as Exhibit "4" and incorporated by reference is a true and correct copy of the Articles of Dissolution filed by CTS of Asheville, Inc. with the North Carolina Secretary of State.

15) After the dissolution of CTS of Asheville, Inc., the corporation continued to operate as CTS Corp., Asheville Division. A true and correct copy of CTS Corp.,

Ashville Division's "Hazardous Waste Generators Annual (Part A) Report" signed by Ronnie Lewis on February 10, 1984 is attached hereto and incorporated by reference as Exhibit "5."

16) In 1983 the total amounts of trichloroethylene stored or shipped by CTS of Asheville, Inc. and/or CTS Corp., Inc. were greatly reduced. By February 10, 1984, CTS Corp., Asheville Division, reported having only 3960 pounds of trichloroethylene on hand, and only shipped 4,630 pounds of trichloroethylene to Environmental Recycling in 1983 (formally Armageddon Chemical of Durham, North Carolina).

17) In its various filings with the State of North Carolina, CTS Corp. and/or its former subsidiary CTS of Asheville, Inc. have failed to account for over 1,000,000 pounds of the spent halogenated solvent, trichloroethylene.

18) The chemicals CTS Corp. left on the site of its electroplating facility were the personal property of CTS, Corp.

19) CTS Corp. ceased operating the Mills Gap Road Electroplating Facility on or about November 1, 1985.

20) In late 1986 or early 1987, CTS Corp. began an effort to try to sell the real property it owned and formerly operated as the Mills Gap Road Electroplating Facility.

21) As part of its efforts to sell the Mills Gap Road Electroplating Facility and surrounding land, CTS Corp. represented to realtors and the community that the site "has been rendered in an environmentally clean condition."

22) A true and correct copy of Marvin Gobles, P.E. letter to Stan Greenberg of January 27, 1987 is attached hereto and incorporated by reference as Exhibit "6."

23) On or about June 25, 1987 CTS Corp. agreed to sell the 54 acres of the

Mills Gap Road industrial site to a partnership, Mills Gap Road Associates. Mills Gap Road Associates, a general partnership, agreed to purchase the 54 acre site from CTS Corp. As part of the agreement CTS Corp provided specific warranties stating the lack of environmental contamination on the property.

24) A true and correct copy of the "Contract of Sale of Realty" between CTS Corp and Mills Gap Road Associates is attached hereto and incorporated by reference as Exhibit "7."

25) CTS Corp., as part of the "Contract of Sale of Realty" specifically warranted as follows:

> Seller [CTS Corp.] warrants that the Property will be the subject of an environmental audit, the results of which will be provided to the Buyer. If the results of the environmental audit indicate the presence of contaminants on or under the Property, in amounts that would exceed any applicable governmental rules or regulations, Buyer shall have the option of terminating this Contract without any further liability if the Seller decides not to undertake to remedy the identified contamination.

Exhibit "7." at 2, ¶ 5.

26) The sale of the land was finalized on December 23, 1987.

27) Mills Gap Road Associates only purchased the real property formally owned by CTS Corp. and various plant machines. Mills Gap Road Associates did not purchase any toxic chemicals from CTS, Corp.

28) The partnership never purchased, nor did it intend to purchase, any of the spent halogenated solvent, trichloroethylene, created and owned by CTS Corp. CTS Corp. left its personal property, over 1,000,000 pounds of spend halogenated dangerous toxic chemicals at the Mills Gap Road site.

29) Plaintiffs are either residents of the property formally owed by CTS of

Asheville, Inc. and Mills Gap Road Associates, or are land owners near the former CTS of Asheville, Inc. site whose ground water and land is being contaminated by the various toxic substances owned by CTS, Corp.

30) By 2002, Defendant CTS Corp. received actual notice that the toxic substances it left at its former Mills Gap Road facility were leaching out and contaminating the ground water in the vicinity and seeping on to the property of the abutting land owners as well as releasing toxic fumes into the air.

31) Through the present CTS Corp. has been and continues to be aware that its toxic substances continue to leach into the ground water and air surrounding its former Mills Gap Road facility and continue to contaminate the environment including the land owned and occupied by the Plaintiffs.

### III. COUNT I: NUISANCE

32) Plaintiffs reallege and reaver each and every allegation set forth in the foregoing paragraphs as if fully rewritten herein.

33) The toxic chemicals abandoned by CTS Corp., have begun to leach out into the air and water in the surrounding community and are continuing to contaminate the air, land and water in the vicinity of Mills Gap Road.

34) On November 23, 2009, Plaintiffs David Bradley and Renee Richardson were advised by the United States Environmental Protection Agency, Region 4 that their well contained TCE and DCE (cis-1,20dicholroethene). Specifically the letter stated:

> TCE was initially detected at a concentration of 842 micrograms per liter (ug/L); cis-1,2-dichoroethene (DCE) was also detected at a concentration of 65.8 ug/L. The concentration of TCE in the sample was too high for calibration of the instrument and thus was designated with a qualifier of "E," meaning "exceeds calibration range."

Letter from EPA to David Bradley dated November 23, 2009, attached hereto and incorporated by reference as Exhibit "8."

35) The well water supplied to the Richardson and Bradley was not fit for human consumption. Indeed the EPA could not even determine the true concentration of the toxins in the water. The EPA informed the family,

> The probable result is that the concentrations of the TEC in this diluted sample are likely biased low. Regardless of the variability in concentration, all of these results are able the RAL ["Removal Action Level"] and MCL ["Maximum Contaminant Level"], supporting the need for EPA to supply an alternate drinking water supply to you and your family.

Exhibit "8" at 1.

36) The other Plaintiffs in this action live in the vicinity of the Richardson and Bradley residence. All of the Plaintiffs have been and continue to be exposed to the CTS Corp. toxins via contact from air, land and water.

37) The actions for CTS Corp. constitute a continuous nuisance under the law of North Carolina.

38) Plaintiffs have been and are continuing to be harmed by the nuisance created by CTS Corp. for reasons including but not limited to the diminution in the value of their real property. In addition the Plaintiffs are afraid for their health and safety and that of their family members.

WHEREFORE: the Plaintiffs demand judgment against the Defendant requiring reclamation of the 1,000,000 pounds of toxic chemical contaminants belonging to CTS Corp., remediation of the environmental harm caused by the CTS Corp.'s toxic chemicals as well as monetary damages in an amount that will fully compensate them for all the losses and damages they have suffered, or and will suffer in the future as allowed by the

applicable law; for trial by a jury; and for costs, fees and other further relief that the Court may deem just and proper.

/s/Joseph L. Anderson
Attorney for Plaintiffs
ANDERSON PANGIA & ASSOC., PLLC
Washington, D.C. Office:
1717 N Street N.W.
Washington, D.C. 20036
Telephone: (800) 735-4062
Fax: (202) 955-9444
North Carolina Office:
2615 Sparkling Place
Winston Salem, NC 27103
Telephone: (800) 735-4062
Fax: (866) 489-2916
E-mail: janderson@andersonpangia.com
N.C. State Bar No.19533